ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
KATHERINE L. WAWRZYNIAK (CABN 252751)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Frank.Riebli@usdoj.gov
    Katherine.Wawrzyniak@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DAVID VIGIL, <br><br> Defendant. | Case No. CR 16-382 HSG <br><br> GOVERNMENT'S SENTENCING MEMORANDUM <br><br> Date:  August 27, 2018 <br> Time:  2:00 p.m. |

## I.     INTRODUCTION

David VIGIL was an important part of Oscar Escalante's drug trafficking organization. VIGIL was one of at least two suppliers who provided heroin and methamphetamine to Escalante, and VIGIL helped Escalante manage his marijuana grow operations in Delano and McFarland. VIGIL's role makes him one of the more culpable defendants in this 22-defendant drug conspiracy. At the same time, unlike several of his co-defendants (including Escalante), VIGIL made the wise decision not to arm himself. For these reasons, and because VIGIL joined in a seven-person resolution, the government entered a plea agreement under Rule 11(c)(1)(C) which provides for a 121-month prison term, followed by 5 years of supervised release. Probation concurs in that resolution.

## II. FACTS

VIGIL had at least two roles in Escalante's organization. He supplied Escalante with heroin and methamphetamine, and he oversaw the operations at two of Escalante's grow houses in the Central Valley. Pre-Sentence Report ("PSR") ¶¶ 24-25. In December 2015, VIGIL supplied three pounds of methamphetamine and two pounds of heroin to one of Escalante's associates so that person could distribute the drugs out of state (where the profits were higher). Id. ¶ 25. The Arkansas State Police seized those drugs – they were 1,533.6 grams of 97% pure methamphetamine (1,431 grams of actual methamphetamine) and 1,006 grams of heroin. Id. Telephone calls intercepted in mid-2016 indicate that VIGIL was still supplying methamphetamine and heroin to Escalante. For example, in June 2016, Escalante and VIGIL spoke about prices for both drugs and about the inconsistent supply of heroin.[1] Moreover, when agents searched VIGIL's house in August 2016, they seized 160 grams – about six "pieces" – of black tar heroin.[2]

VIGIL also helped Escalante manage operations at Escalante's Central Valley grow houses. VIGIL paid the bills (rent and utilities), checked up on Escalante's workers, and helped with distribution of the processed marijuana. Id. ¶ 24.

This is not the first time VIGIL has been involved in drug trafficking. He has two prior convictions for possession for sale, PSR ¶ 46, and served a three-year prison term for one of them.[3] Only the latter conviction scores for purposes of calculating his criminal history, but the fact of convictions from 1993, 2002 and now 2018, suggests long-term involvement in the drug trade.

## III. DISCUSSION

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the

---

[1] Target Telephone 2 call 5871 on 6/10/16 at 1119 hrs.

[2] Unlike methamphetamine, heroin is sold in 25-gram "pieces" rather than 28-gram ounces.

[3] VIGIL was arrested on June 23, 2001 for possession of a controlled substance for sale. PSR ¶ 61. On May 30, 2002, he entered state prison (San Quentin) to serve a 3-year prison term. It appears that prison term was imposed after a conviction following the June 23, 2001 arrest. According to the California Department of Corrections and Rehabilitation, VIGIL was paroled on September 11, 2003 and discharged from parole on October 11, 2004.

GOVT SENTENCING MEMO.                    2
CR 16-382 HSG

defendant, and rehabilitate the defendant. 18 U.S.C. § 3553(a)(2); United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008). The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); Carty, 520 F.3d at 991. A sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment to the offender, deter the defendant and others from committing similar crimes in the future and protect the community from future crimes of the defendant. 18 U.S.C. § 3553(a)(2). The Guidelines should be the starting point and the initial benchmark. Gall v. United States, 552 U.S. 38, 49 (2007). Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." Rita v. United States, 551 U.S. 338, 350 (2007).

### A.  VIGIL's Guidelines Range is 120-135 Months.

The government calculates VIGIL's Guidelines range as follows:

| | |
|---|---|
| Base Offense Level, § 2D1.1(c)(3) | 34 |
| Acceptance of Responsibility, § 3E1.1 | -3 |
| Early Disposition, § 5K2.0(a)(2)(B) | -2 |
| Total Offense Level | 21 |
| Criminal History Category (4 points) | III |
| Range | 120-135 |

#### 1.  The Base Offense Level is 34.

The offense level in a drug case is determined by the aggregate weight of the drugs for which the defendant is responsible. U.S.S.G. § 2D1.1 applic. notes 5, 7. The parties agreed that VIGIL is responsible for the equivalent of 29,777 kilograms of marijuana. Plea Agmt ¶ 2. The drug quantity is based on the plants cultivated between 2014 and 2016 in the two grow houses that VIGIL oversaw (estimated at 1,513 plants), plus the methamphetamine (1,431 grams of actual methamphetamine) and heroin (1,006 grams) seized from Reayoung in Arkansas on December 2, 2015. The calculation for those drugs is as follows:

| | | |
|---|---|---|
| Marijuana: 1,513 plants * 100 g/plant = | | 151 kg marijuana |
| Methamphetamine: 1,431 grams * 20 kg/gram = | | 28,620 kg marijuana |
| Heorin: 1,006 grams * 1 kg/gram = | | 1,006 kg marijuana |

That quantity of marijuana equivalent is a base offense level 34. U.S.S.G. § 2D1.1(c)(3) (10,000 to 30,000 kg).

### 2. VIGIL Receives a Three-Level Deduction for Early Acceptance.

VIGIL notified the government of his intent to plead guilty before the government began preparing for trial against him. Therefore, he should receive a three-level deduction for early acceptance of responsibility. Id. § 3E1.1.

### 3. VIGIL Receives a Two-Level Deduction as Part of a Global Resolution.

The Guidelines provide for downward departures "in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that is nevertheless relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2)(B). Courts have applied § 5K2.0 and awarded downward departures where multiple defendants join in a group disposition. See, e.g., United States v. Garcia, 926 F.2d 125, 128 (2d Cir. 1991) (affirming a 4-level downward departure for a defendant who "broke the log jam" and induced two other defendants to plead guilty); United States v. Mastronardo, 22 F. Supp. 3d 490, 497-98 (E.D. Pa. 2014) (2-level downward departure under § 5K2.0 for 11-defendant global plea); Matera v. United States, 2006 WL 3479067, at *2 (E.D.N.Y. 2006) (four-point deduction for participation in global plea agreement). See also U.S. v. Jesse Aguilar, N.D. Cal. Case No. CR 11-355 EJD Docket #800 (government agreed to 2-level downward variance for all defendants in group disposition).

VIGIL participated in a group disposition involving seven defendants. As the government has explained before, this group resolution not only saved significant resources for both the Court and the government, it also changed the dynamic for the remaining defendants and encouraged them to enter settlement negotiations. Moreover, the group of seven VIGIL joined were among the first defendants to plead guilty. For these reasons, the government agreed to a two-level reduction in his offense level under U.S.S.G. § 5K2.0.

///

### 4. VIGIL Is Subject to a 120-Month Statutory Minimum Sentence.

VIGIL pleaded guilty to Counts One and Two of the Superseding Indictment. Plea Agmt ¶ 1. Count Two carries a 120-month statutory minimum sentence. VIGIL is not eligible for Safety Valve relief because, among other things, he has four criminal history points and is in Criminal History Category III. See 18 U.S.C. ¶ 3553(f)(1) (only defendants with 0 or 1 criminal history point are eligible for Safety Valve relief). VIGIL's 2002 conviction counts for three points. U.S.S.G. § 4A1.1(a) & applic. note 1. In addition, his 2008 conviction for driving without a license, PSR ¶ 50, counts for one point because he received more than one year of probation. U.S.S.G. § 4A1.1(c)(1).[4] Thus, 120 months is the lower-bound of the applicable sentencing range. U.S.S.G. § 5G1.1(c)(2).

### B. The Government Recommends 121 Months.

The parties agreed that a reasonable sentence in this case is 121 months. Plea Agmt ¶ 8. The Court must decide whether to accept or reject the parties' agreement. Fed. R. Crim. Proc. 11(c)(3)(A). The Court has broad discretion to accept or reject the plea agreement. United States v. Harris, 679 F.3d 1179, 1182 (9th Cir. 2012). The Court should consider whether the negotiated sentence "is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case." Id. See also United States v. Miller, 722 F.2d 562, 565 (9th Cir. 1983) (categorical rules regarding acceptance or rejection of plea agreements are improper). For the reasons discussed below, the government believes that the negotiated sentence is appropriate and asks that the Court accept the agreement.

VIGIL was involved in both of two overlapping drug conspiracies. His involvement in the hard-drug conspiracy is a reflection of the fact that he was a member of Escalante's inner circle – one of only a handful of co-conspirators whom Escalante trusted with knowledge of his involvement in trafficking drugs other than marijuana. And as a supplier, VIGIL's role in trafficking those drugs was more important to Escalante's operation. Whereas street dealers like Daniel Medina are expendable, suppliers are fewer in number, and less-easily replaced. Indeed, the drugs VIGIL supplied to Reayoung were high quality: a kilo of white powder heroin (which is still relatively rare west of the Mississippi), and 1.5

---

[4] The government failed to note these differences in its review of the draft PSR. The government's understanding is that Probation is preparing an amendment to the PSR. The government apologizes for the oversight.

GOVT SENTENCING MEMO.        5
CR 16-382 HSG

kilos of 97% pure methamphetamine.  An associate with access to those kinds of drugs, in those quantities, is essential to a trafficker like Escalante.

Moreover, the drugs VIGIL supplied are a scourge on our community.  Heroin has become part of a devastating epidemic of overdoses that killed more than 568,000 people between 1999 and 2015.  See "Overdose Deaths Involving Opioids, Cocaine, and Psychostimulants – United States, 2015-2016," Centers for Disease Control & Prevention ("CDC"), Morbidity & Mortality Weekly Report ("MMWR") (Mar. 30, 2018) ("MMWR I") at 1.  In 2016, heroin alone killed 15,469 people.  Id. Table 2.  Indeed, since 2010, deaths related to heroin have spiked – increasing more than five-fold (from 3,036 in 2010 to 15,469 in 2016) – as people who became addicted to opioids through prescription drugs moved to the cheaper, more easily-obtained and more powerful heroin.  See "Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014," MMWR (Jan. 1, 2016) ("MMWR II") at 1379-1380.  Heroin use thus represents the next – and in many cases, final – chapter in an epidemic that claimed 63,632 lives in 2016.  See MMWR I at 1.  The statistics are stunning.  So stunning that it is easy to get lost in the numbers and forget that those numbers refer to real victims, with real families, who feel real pain.

Methamphetamine too is a highly-addictive and destructive drug.  For better or worse, meth tends not to kill as quickly as heroin and other opioids – instead, users live long enough to suffer a range of maladies before their bodies finally give out.  "The consequences of methamphetamine abuse are terrible for the individual – psychologically, medically, and socially."  Nat'l Inst. on Drug Abuse, "Methamphetamine Abuse and Addiction," Nat'l Inst. of Heath Pub. 13-4210 (rev. Sept. 2013) at 1.[5] Methamphetamine can cause memory loss, aggression, psychotic behavior, cardiovascular damage, malnutrition and severe dental problems from the dry mouth and bruxism that commonly accompany its use.  Id.  "Beyond its devastating effects on individual health, methamphetamine abuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse and other social ills," including increased transmission of infectious diseases, such as hepatitis and HIV/AIDS.  Id.  Though meth use is on the decline nationally, it remains a significant problem in Northern California.  For the first half of 2012, methamphetamine ranked second in drug-related treatment admissions in San

---

[5]  This report is available at https://www.drugabuse.gov/publications/research-reports/methamphetamine/letter-director, and the tabs associated with it (last visited Jan. 6, 2017).

GOVT SENTENCING MEMO.                                6
CR 16-382 HSG

Francisco emergency rooms. Id. at 2. The enormous costs of methamphetamine use – estimated at $23.4 billion nationally in 2005 – are apparent every day in every Superior Court in this District. Meth may not be implicated in as many deaths annually as heroin and opioids, but it is a drug with enormous human costs.

There is no other way to describe involvement in the heroin and methamphetamine trade – especially at the level that VIGIL and Escalante operated – than the intentional poisoning of one's neighbors. VIGIL poisoned his neighbors for money. The meth and heroin that the Arkansas State Police seized from Reayoung, by itself, represented at least over 14,000 doses of methamphetamine and over 10,000 doses of heroin.[6]

And this is not the first time VIGIL has been involved in the drug trade. He was sentenced to three years in state prison in 2002 for possession of a controlled substance for sale. The sentence in this case represents a significant increase in prison time, but that is appropriate for someone who has continued to traffic drugs even after going to prison for it once before. VIGIL claims that he was selling to support his own habit. PSR ¶ 74. But the volumes of drugs he was distributing, plus the fact that he has had no positive tests while on pre-trial release, id., suggest that his own drug habit was not so controlling a factor in his decision-making that it might mitigate his own culpability.

A 121-month sentence in this case is commensurate to VIGIL's role in this offense. As a supplier, he is more culpable than the lower-level associates in the hard-drug conspiracy, like Daniel Medina, and should receive a higher sentence. He also oversaw the operations of Escalante's grow houses, and thus was more than a gardener, like James Hinkle, Phillip Jiunti, and Ignacio Gonzalez.[7] He should receive longer sentences than they received or are likely to receive as well. The Court sentenced Ignacio Gonzalez to 60 months plus 1 day, Medina to 66 months, and Jiunti to 70 months. At the same

---

[6] Unlike methamphetamine, heroin – especially the white powder heroin that VIGIL supplied to Reayoung – usually gets "cut," or diluted, at every step of the distribution process. Thus, the kilo of heroin seized from Reayoung likely would have been doubled or tripled in volume before it ended up the hands of a user.

[7] The government did not insist on an enhancement for maintaining a drug-involved premises because the grow houses that VIGIL oversaw were Escalante's grow houses, Escalante had direct contact with at least one of the gardeners there (Hinkle) and closely monitored and controlled those operations, and Escalante accepted an enhancement for maintaining a premises. For those reasons, Escalante accepted an enhancement under § 2D1.1(b)(12), and the government did not insist that VIGIL do the same.

GOVT SENTENCING MEMO.          7
CR 16-382 HSG

time, VIGIL was not armed, and that distinguishes him from people like Escalante and Vicochea. Guns in the hands of drug dealers is an evil in itself and warrants stiff punishment. Escalante and Vicochea each accepted an additional 60 months because they had guns. Thus, although VIGIL was a supplier to Escalante and, through him, to Vicochea, it is appropriate that Escalante and Vicochea receive longer sentences because they also armed themselves. Escalante received 235 months and Vicochea agreed to 180 months. A 121-month prison term for VIGIL appropriately punishes him for his conduct, while maintaining separation between his sentence and the sentences Escalante and Vicochea received or likely will receive.

## IV.   CONCLUSION

For the foregoing reasons, the government recommends that the Court accept the parties' agreement and impose a 121-month prison term, followed by 5 years of supervised release on the terms Probation recommends.

DATED:                                              Respectfully submitted,

                                                    ALEX G. TSE
                                                    United States Attorney


                                                    _____/s/_____
                                                    FRANK J. RIEBLI
                                                    KATHERINE L. WAWRZYNIAK
                                                    Assistant United States Attorney